Evelyn HEINRICH on behalf of her husband George Heinrich, Henry M. Sienkewicz, Jr., on behalf of his mother Eileen Rose Sienkewicz, Rosemary Gualtieri on behalf of her father Joseph Mayne, Walter Carl Van Dyke on behalf of his father Walter Carmen Van Dyke, and all others similarly situated, Plaintiffs,

v.

William H. SWEET, M.D., trustee of the Lee Edward Farr Trust Dated 1/11/71, as amended, The Estate of Lee Edward Farr, M.D., Associated Universities, Inc., Massachusetts General Hospital, Massachusetts Institute of Technology, and The United States of America, Defendants.

Civil Action No. 97–12134–WGY.

United States District Court,
D. Massachusetts.

April 30, 1999.

30

McGuire & McGuire, Worcester, MA, for Evelyn Heinrich.

John K. McGuire, Jr., McGuire & McGuire, Worcester, MA, Raymond J. Heslin, Gold, Farrell & Marks, New York City, Anthony Z. Roisman, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for Henry M. Sienkewicz, Jr.

Raymond J. Heslin, Gold, Farrell & Marks, New York City, for Rosemary Gualtieri.

Raymond J. Kenney, Mark Newcity, Christopher J. Maley, Martin, Magnuson, McCarthy & Kenney, Boston, MA, Gail A. Anderson, Martin, Magnuson, McCarthy & Kenney, Boston, MA, for William H. Sweet, MD., Massachusetts General Hospital.

William Shields, Sarah G. Hunt, Day, Berry & Howard, Boston, MA, Kevin T. VanWart, Jerome A. Karnick, Marc J. Zwillinger, Kirkland & Ellis, Chicago, IL, Kevin T. Van Wart, Jonathan Silverman, Kirkland & Ellis, Chicago, IL, for Lee Howard Farr, M.D.

William Shields, Sarah G. Hunt, Day, Berry & Howard, Boston, MA, Jerome A. Karnick, Marc J. Zwillinger, Kevin T. Van Wart, Jonathan Silverman, Kirkland & Ellis, Chicago, IL, Mark Newcity, Martin Magnuson, McCarthy & Kenney, Boston, MA, for Associated Universities, Inc.

Francis C. Lynch, Lori B. Silver, Palmer & Dodge, Boston, MA, for Massachusetts Institute of Technology.

Burke M. Wong, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for USA.

Herbert E. Milstein, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for Walter Carl Van Dyke.

### MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### I. *Introduction*

This cause of action arises out of experiments conducted on individuals under the

Raymond J. Heslin, Gold, Farrell & Marks, New York City, Anthony Z. Roisman, Cohen, Milstein, Hausfeld & Toll, Washington, D.C., John K. McGuire, Jr.,

care of Massachusetts General Hospital and Brookhaven National Laboratory in the 1950s and 1960s.[1] The plaintiffs (collectively, the "Plaintiffs") in this action are comprised of two groups: Evelyn Heinrich and Henry Sienkewicz, who are Massachusetts residents suing on behalf of themselves and deceased family members who received treatment at Massachusetts General Hospital and the Massachusetts Institute of Technology, and Rosemary Gualtieri and Walter Carl Van Dyke, who are suing on behalf of themselves and deceased family members who received treatment at Brookhaven National Laboratory. The Plaintiffs allege that various doctors, institutions, and the United States government conspired to conduct "extensive, unproven and dangerous medical experiments on over 140 terminally ill patients, without their knowledge or consent." Am. Comp. ¶ 2. The experiments consisted primarily of boron neutron capture therapy ("BNCT"), most charitably described as a combination of traditional chemotherapy and radiation therapy. For the purposes of the present motion, the Plaintiffs seek redress from Lee Farr, M.D.,[2] and Associated Universities, Inc.[3] (together, "Associated Universities"); William H. Sweet, M.D.,[4] and Massachusetts General Hospital (together, "Mass General"); and the Massachusetts Institute of Technology ("MIT"). The Plaintiffs allege eleven causes of action against these defendants: (i) violation of Constitutional and civil rights (a *Bivens* action), (ii) civil fraud, (iii) battery, (iv) intentional infliction of emotional distress, (v) strict liability for inherently dangerous activities, (vi)

personal injury caused by exposure to toxic substances, (vii) absence of consent, (viii) wrongful death, (ix) civil responsibility for crimes against humanity, (x) negligence, and (xi) negligent misrepresentation. This action was originally filed in the Eastern District of New York and later transferred to this District.

## II. *The Instant Motions*

### A. *Associated Universities' Motion to Dismiss*

Associated Universities moves to dismiss the Second Amended Complaint on a variety of grounds. First, that the statute of limitations bars all of the Plaintiffs' claims. Second, that the Massachusetts Plaintiffs lack standing because they were not treated at Brookhaven National Laboratory. Third, that all of the Plaintiffs lack standing because they claim only derivative injuries. Fourth, that the *Bivens* action should be dismissed because Associated Universities is not a federal actor. Fifth, that the fraud and negligent misrepresentation counts should be dismissed because no false statements have been alleged by Associated Universities. Sixth, that the battery and intentional infliction of emotional distress counts should be dismissed because the Plaintiffs consented to the experiments. Seventh, that the strict liability for inherently dangerous activities counts should be dismissed because no invasion of land has been alleged. Eighth, that the personal injury for toxic substances and civil responsibility for crimes against humanity counts should be dismissed because no such causes of action

---

1. A more thorough statement of the relevant facts appears in this Court's Memorandum dated April 20, 1999 ("Heinrich I").

2. Dr. Farr was purportedly "the principal supervisor and instigator of the BNCT experiments at Brookhaven." Am. Comp. ¶ 21. Farr died in 1997. The Plaintiffs substituted "the Trustee of the Lee Edward Farr Trust Dated 1/11/71" for Dr. Farr. In addition, the caption to the Second Amended Complaint names "The Estate of Lee Edward Farr, M.D." For simplicity, this Memorandum re-

fers to Farr and his successors in interest as "Farr."

3. Associated Universities, Inc., is a "scientific and educational institution" that operated Brookhaven National Laboratory during the relevant time period. Am. Comp. ¶ 26.

4. Dr. Sweet allegedly "conducted and supervised many of the experiments [at Massachusetts General Hospital]." Am. Comp. ¶ 22.

exist. Finally, Associated Universities argues that the claim for punitive damages is barred by New York's Survival Statute and Wrongful Death Statute.

### B. *Mass General's Motion to Dismiss*

Mass General seeks dismissal of several of the Plaintiffs' claims. First, that the claim for crimes against humanity should be dismissed because no such cause of action exists. Second, that all state law claims brought by decedent Walter Carmen Van Dyke and his representative ("Van Dyke") must be dismissed because Mass General did not owe a duty to Van Dyke. Finally, that all claims for emotional distress brought by all Plaintiffs should be dismissed because the alleged harm is too remotely related to the experiments.

### C. *Mass General's Motion for Judgment on the Pleadings*

Mass General also seeks judgment on the pleadings pursuant to Rule 12(c), arguing that all claims brought by the Plaintiffs are barred under the respectively applicable statutes of limitations.

### D. *MIT's Motion to Dismiss*

MIT seeks dismissal on a variety of grounds. First, that the *Bivens* action should be dismissed either because MIT was not a federal actor or because it was entitled to qualified immunity. Second, that the state law claims which rest on deceit or misrepresentation should be dismissed because the Plaintiffs have not alleged any such conduct by MIT. Third, that state law claims which rest on a requirement of informed consent should be dismissed because MIT did not owe a duty to provide information to the Plaintiffs. Fourth, that the state law claim of strict liability for inherently dangerous activities should be dismissed because no invasion of

land has been alleged. Fifth, that the remaining state law claims should be dismissed because MIT did not owe a duty to the Plaintiffs. Sixth, that the civil action for crimes against humanity must be dismissed because no such cause of action exists. Finally, that Van Dyke's claims should be dismissed for additional reasons particular to his case.

### III. *Discussion*

In reviewing a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff."[5] *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir.1992). The Court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Clair Recreation Ctr., Inc. v. Flynn*, 897 F.2d 623, 625 (1st Cir.1990) (*quoting Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957] ).

### A. *Statute of Limitations for State Law Claims*

Associated Universities and Mass General argue that all of the Plaintiffs' claims are barred by the applicable statutes of limitations because the purported experiments and resulting injuries occurred decades ago. The Plaintiffs, on the other hand, contend that the claims survive despite the lapse of time because of the "discovery rule," the existence of fraudulent concealment by the various defendants, or the principle of equitable estoppel.

■ As an initial matter, this Court treats the assertion of the statute of limitations as an affirmative defense to be entertained as a motion to dismiss under Fed.

---

**5.** A motion brought under Rule 12(c) of the Federal Rules of Civil Procedure "should be evaluated under the familiar standard applicable to a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can

be granted." *Massachusetts Candy & Tobacco Distrib., Inc. v. Golden Distrib., Ltd.*, 852 F.Supp. 63, 67 (D.Mass.1994) (Karol, M.J.); *see also Doe v. Londonderry School Dist.*, 970 F.Supp. 64, 70 (D.N.H.1997).

R.Civ.P. 12(b)(6). *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 351–520 (2d ed.1990).[6] Therefore, taking all facts and inferences drawn therefrom in the Plaintiffs' favor, this Court should only grant Associated Universities' and Mass General's motion "if it clearly appears according to the facts alleged, that the plaintiff cannot recover on any viable theory." *Figueroa v. Rivera*, 147 F.3d 77, 80 (1st Cir.1998). Despite this low threshold, the pleading requirement is "not entirely a toothless tiger." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir.1996). In order to survive a motion to dismiss, the Plaintiffs must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery." *Id.* at 190. As such, the Court need not accept "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." *Id.*

■ Associated Universities asserts that New York state law controls the Court's analysis of the statute of limitations issue. Mass General and the Plaintiffs, on the other hand, analyze the issue on the assumption that Massachusetts law controls. The parties are at least correct in assuming that state rather than federal law controls the statute of limitations peri-

ods for the state law causes of actions. *See Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 110, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) (deeming statute of limitations "substantive" and thus required by *Erie* to be decided under state law). It is also clear that state rather than federal choice of law rules determine which state's statute of limitations period will apply. *See generally Dykes v. DePuy, Inc.*, 140 F.3d 31, 39 (1st Cir.1998).[7] What is not clear, however, is which state's choice of law rules will be used to determine which state's statutes of limitations apply.

■ Associated Universities argues that because the action was transferred here from the United States District Court for the Eastern District of New York, this Court must apply the choice-of-law rules that would apply in that district. *See Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) ("[A] change of venue ... should be, with respect to state law, but a change of courtrooms."); *Brown v. Hearst Corp.*, 862 F.Supp. 622, 626 (D.Mass.1994) (Tauro, C.J.) ("When a case is transferred to a new venue pursuant to 28 U.S.C. § 1404[a], the choice of law rules of the transferor venue apply."). This analysis rests on the assumption that Judge Hurley of the Eastern District of New York

---

**6.** If matters outside the complaint are considered by the Court, the motion to dismiss could be converted to a motion for summary judgment under Fed.R.Civ.P. 56. *See C.B. Trucking, Inc. v. Waste Management, Inc.*, 137 F.3d 41, 43 (1st Cir.1998). In this instance, only the Plaintiffs have submitted additional materials. Consequently, the Court will not convert the motion.

**7.** Mass General cites several cases for the proposition that choice of law issues should be resolved by federal law for all aspects of a federal question case. *See* Mass General Reply at 1–2 (citing *Edelmann v. Chase Manhattan Bank*, 861 F.2d 1291 [1st Cir.1988]; *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786 [2d Cir.1980]; *In re Lindsay*, 59 F.3d 942 [9th Cir.1995]; *Blackstone Valley Elec. Co. v. Stone & Webster, Inc.*, 867 F.Supp. 73 [D.Mass.1994]). Each of these cases is inapposite, however, as each

involved a situation in which state law issues arose *within* rather than *pendent to* a federal cause of action. *See, e.g., Edelmann*, 861 F.2d at 1294 n. 14 (Edge Act); *Corporacion Venezolana*, 629 F.2d at 795 (Edge Act); *In re Lindsay*, 59 F.3d at 948 (bankruptcy); *Blackstone Valley*, 867 F.Supp. at 77 n. 6 (CERCLA). When the state law issue arises within a cause of action over which the federal courts have exclusive jurisdiction, the risk of forum shopping which prompted *Erie* and *Klaxon* is significantly reduced. *See In re Lindsay*, 59 F.3d at 948. When the state law cause of action is pendent to a federal one, however, the risk of forum shopping remains because of the ability of plaintiffs to add federal causes of action in order to obtain federal jurisdiction, even though state law causes of action may predominate. In this case, for instance, only two federal counts have been brought compared to nine state law counts.

transferred this case pursuant to 28 U.S.C. § 1404(a). In actuality, however, Judge Hurley expressly declined to state whether he was transferring the case pursuant to 28 U.S.C. § 1404(a) or § 1406(a). *See* Tr. of Bench Decision, Aug. 20, 1997 at 12 (transferring without specifying which provision controlled because under either provision, the case would end up in Massachusetts). When a case is transferred pursuant to section 1406(a), the choice of law rules of the transferee forum apply, rather than the transferor forum. *See Adam v. J.B. Hunt Transport, Inc.,* 130 F.3d 219, 230 (6th Cir.1997) (noting that when transfer occurs for the convenience of the parties under section 1404[a], the law of the transferor forum applies, but when transfer occurs due to an improper forum under section 1406[a], the law of the transferee forum applies). Thus, this Court cannot determine whether to apply the choice of law rules of New York or Massachusetts based solely on Judge Hurley's ruling.

Not surprisingly, other district courts have found themselves in this dilemma. The most expeditious approach is that followed by the Southern District of New York: the transferee court should make a decisive determination whether transfer was effected under sections 1404(a) or 1406(a). *See Davis v. Costa–Gavras,* 580 F.Supp. 1082, 1086 (S.D.N.Y.1984) ("But when a transferor court has not ruled on the propriety of venue or jurisdiction, the transferee court must determine whether venue and jurisdiction would have been proper in the transferor court in order to decide which forum state's law will apply under *Erie*."). *But see Martin v. Stokes,* 623 F.2d 469, 475 (6th Cir.1980) (remanding case to transferor court for clearer determination).

■ Here, Judge Hurley's ruling is instructive. Judge Hurley analyzed the venue under two alternative scenarios. In the first scenario, the Plaintiffs' allegations of a common scheme were accepted as well-pled, such that the actions of each defendant could be imputed to the others. Under that scenario, Judge Hurley viewed venue as proper under 28 U.S.C. § 1391(b) in either Massachusetts or New York such that transfer would occur under 28 U.S.C. § 1404(a). In the second scenario, rejecting the Plaintiffs' joint action theory, the actions of each defendant need to be analyzed separately. Under that scenario, venue would be improper in New York as to some of the Plaintiffs because "a substantial part of the events or omissions giving rise to the claim" could not be viewed as occurring in New York. *See* 28 U.S.C. § 1391(b). Thus transfer would occur under 28 U.S.C. § 1406(a). Because Judge Hurley viewed Massachusetts as the most appropriate venue under either scenario, he did not resolve the common action question.

In arguing the common action question, Mass General argues that the heightened pleading requirements of Fed.R.Civ.P. 9(b) should apply to the Plaintiffs' theory, as it rests on an alleged conspiracy to defraud. *See Hayduk v. Lanna,* 775 F.2d 441, 444 (1st Cir.1985) ("[I]n actions alleging conspiracy to defraud or conceal, the particularity requirements of Rule 9[b] must be met."). This may well be true with respect to the Plaintiffs' actual causes of action which rely on a theory of conspiracy to defraud. For purposes of determining whether venue was proper in New York, however, this Court simply requires that "the claim … be pleaded with reasonable certainty and definiteness so as to inform the opposing party of the nature of the conspiracy charged." *Prudential Ins. Co. of Am. v. Turner & Newall, PLC,* Civ. A. No. 85–2179–H, 1988 WL 150491, at *9 (D.Mass. Dec.12, 1988) (Collings, M.J.). The Plaintiffs have met that requirement, and this Court accepts the Plaintiffs' theory of joint action as well-pled for purposes of determining proper venue. Focusing only on those facts which suggest a common scheme between defendants centered in Massachusetts and those centered in New York (the common scheme among

intrastate defendants not being challenged here), the Plaintiffs have alleged the following facts relevant to a finding of joint action:

▶ The [ ] experiments were the product of a common scheme devised by defendants and were conducted on patients under the care of the Massachusetts General Hospital and other hospitals at reactor facilities at the Brookhaven National Laboratory which was operated by Associated Universities, Inc. in Upton, New York, an Atomic Energy Commission owned nuclear research center, and the Massachusetts Institute of Technology in Cambridge, Massachusetts. Am.Comp. ¶ 1(b).

▶ The principal doctors who, working in concert, devised and implemented these experiments were defendants Dr. Lee E. Farr, Chairman of the Medical Department at [Brookhaven National Laboratory] during all times relevant here and Dr. William H. Sweet, a neurosurgeon at [Mass General]. Am.Comp. ¶ 1(b).

▶ The defendants acting in concert and as part of a common scheme ... conducted extensive, unproven and dangerous medical experiments on over 140 terminally ill patients, without their knowledge or consent. Am. Comp. ¶ 2.

▶ Joseph Mayne was a patient at [Mass General] but was transported to [Brookhaven National Laboratory] by Dr. Sweet where, under the supervision of Drs. Sweet and Farr, he received a boron injection and BNCT. Am.Comp. ¶ 3.

▶ According to an article by Farr, Sweet and others published in February 1954, the dose of B10 was 1.69 grams given intravenously in the form of borax. Am.Comp. ¶ 14.

▶ In the early 1950s, the [Atomic Energy Commission], Dr. Sweet, Dr. Farr, [Associated Universities], and [Mass General] undertook a joint enterprise, funded by the [Atomic Energy Commission] ... to use terminally ill brain cancer patients as "test animals" for their theory that BNCT would work. Am.Comp. ¶ 36.

▶ Drs. Sweet and Farr were directly and jointly involved in making the decisions [concerning the experiments].... These joint activities are evident from articles written jointly by Drs. Sweet and Farr on the results of experiments with BNCT and articles written by others about the work of Drs. Farr and Sweet. Am.Comp. ¶ 37.

▶ The first trial of BNCT began in February 1951 at [Brookhaven National Laboratory] and Drs. Sweet and Farr were jointly involved in the process. This first trial lasted 24 months and involved 10 patients broght [sic] by Dr. sweet [sic] from [Mass General].... Am.Comp. ¶ 47.

▶ Dr. Sweet and [Mass General] were directly involved with the first two rounds of BNCT at [Brookhaven National Laboratory] and, on information and belief, Dr. Sweet was consulted with regard to all BNCT related experiments at [Brookhaven National Laboratory]. He also became involved in developing a brain tumor experiment facility at MIT which was funded by the [Atomic Energy Commission] and, on information and belief, with respect to which [Brookhaven National Laboratory] was consulted. Am.Comp. ¶ 54.

Thus, the interrelationship of the defendants is manifest in the Amended Complaint. Accordingly, for purposes of determining whether venue was proper in New York, this Court holds that the allegation of a common scheme between the defendants was well-pled. As such, the actions of the defendants could be attributed to one another, such that New York was a proper venue for all defendants due to the fact that "a substantial part of the events or omissions giving rise to the claim" oc-

curred in New York. *See* 28 U.S.C. § 1391(b). Because New York was a proper venue, Judge Hurley's transfer of the case to the District of Massachusetts should be seen as having occurred under section 1404(a) rather than section 1406(a). Therefore, New York's choice of law rules apply to the determination of which state's statutes of limitations govern this case.

■ Because New York courts treat the statute of limitations as procedural, "New York courts generally apply New York's statutes of limitations, even when the injury giving rise to the action occurred outside New York." *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998); *see also Stafford v. International Harvester Co.*, 668 F.2d 142, 147 (2d Cir. 1981) ("Under New York law the statute of limitations is considered procedural since it goes to the remedy, and New York will apply its own statute of limitations even though the injury which gave rise to the action occurs in another state."). Such application includes New York's rules on accrual, tolling, and estoppel. *See Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir.1989).

Because the Plaintiffs operated on the assumption that Massachusetts statutes of limitations applied, the Court lacks adversarial presentation of the germane issues.[8] Having determined that New York statutes of limitations govern the state law claims, the Court ORDERS the parties to resubmit memoranda of law on the statute of limitations defenses. The Defendants shall refile all dismissal motions premised on the statute of limitations for state law claims within thirty days of the date of this Order. The Plaintiffs shall have fourteen days from the date of the Defendants' filing to respond.

**B.** *Statute of Limitations for Federal Law Claims*

■ The determination of which limitations period applies to the federal law claims is much more straightforward. Because these are federal law claims, the district court need not be concerned with the dictates of *Erie* and *Klaxon*. Nevertheless, when a federal cause of action does not have an express federal statute of limitations period, state law may still be relevant because it provides a "borrowed" limitations period for the federal action. The Supreme Court has held that "[w]hen Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Because the Court is now addressing federal question issues, the fact that this case was transferred from the District Court of New York does not enter into the analysis. Instead, the Court simply holds that the Massachusetts' statute of limitations period for general or residual personal injury actions governs the *Bivens* claim and the civil responsibility for crimes against humanity claim. *See Owens v. Okure*, 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (holding that where state has more than one statute of limitations period for personal injury actions, federal court should borrow general period for purposes of civil rights actions).

■ Mass.Gen.L. ch. 260, § 2A provides: "Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues."[9] Determining when a cause of

---

8. The defendants cleverly covered their bases by adopting different positions: Mass General argued Massachusetts law and Associated Universities argued New York law. That, of course, does not amount to adversarial presentation.

9. Mass General contends that the Court must look to the statute as in effect between 1951 and 1961 because that is when the actionable injuries occurred. Instead, the Court applies the statute of limitations that is in effect when the cause of action "arises." *See Ellis v. Ford Motor Co.*, 628 F.Supp. 849, 852 (D.Mass.

action "accrues" in a federal question case such as the *Bivens* action is a matter of federal law. *See Carreras–Rosa v. Alves–Cruz,* 127 F.3d 172, 174 (1st Cir.1997) (holding that "[a]lthough the limitations period is determined by state law" for analogous section 1983 actions, "the date of accrual is a federal law question."). As discussed in the portion of Heinrich I addressing the statute of limitations period for the Plaintiffs' claims under the Federal Tort Claims Act, the Plaintiffs' federal claims are timely pled under the governing standards of accrual. Thus, the Court DENIES the motions to dismiss the *Bivens* claim and the claim for civil responsibility for crimes against humanity insofar as they rely on the statute of limitations defense.

### C.  *Count I—The Bivens Claim*

In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court recognized an implied cause of action for damages against federal agents who allegedly violate a plaintiff's constitutional rights. Determining whether *Bivens* applies to private actors entails a host of legal and factual determinations that cannot be made on the existing record. Consequently, at oral argument on March 18, 1999, the Court ordered the parties to submit further briefs on the viability of the Bivens claim. Following receipt of those briefs, the Court will address the issue in a separate order.

### D.  *Choice of Law for State Law Claims*

Counts two through eight, ten, and eleven each allege state law tort causes of action. As noted above, New York choice of law principles apply to the resolution of state law claims. In New York, the first question to resolve in determining whether

to undertake a choice of law analysis is whether there is an actual conflict of laws. *See Matter of Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). When it can be said that there is no actual conflict, New York will dispense with the choice of law analysis. *See J. Aron & Co. v. Chown,* 231 A.D.2d 426, 647 N.Y.S.2d 8 (1st Dept. 1996). The parties have brought dismissal motions on a multiplicity of state law grounds. These arguments will be addressed utilizing both New York and Massachusetts case law, so long as the states are in agreement regarding the governing rules. Where there is an actual conflict, however, the following analysis will be conducted to determine which state's law should apply:

In tort actions, if there is a conflict of laws, New York courts apply an "interests analysis," under which the law of the jurisdiction having the greatest interest in the litigation is applied. *See Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *see also AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir.1992). "In deciding which state has the prevailing interest, we look only to those facts or contacts that relate to the purpose of the particular laws in conflict. 'Under this formulation, the significant contacts are, almost exclusively, the parties domiciles and the locus of the tort.'" *AroChem Int'l,* 968 F.2d at 270 (quoting *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 [1985]). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993). If the choice of law analysis leads to the application of foreign law, a court

---

1986) (Freedman, J.). As discussed Heinrich I, the federal causes of action in these cases did not "arise" or "accrue" until 1995, when

the Plaintiffs became aware of the alleged true nature of the experiments.

may refuse to apply that law only if its application would be violative of fundamental notions of justice or prevailing concepts of good morals. *See Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998).

### E. *Count III—The Battery Claim*

■ Count III of the Amended Complaint is a claim for battery, charging that "[d]efendants, without legal cause, intentionally injected the class' decedents with toxic substances and irradiated the class' decedents *without consent . . . ."* Am. Comp. ¶ 102 (emphasis added). The Plaintiffs do not contend that their decedents gave no consent at all; rather, they claim that their decedents did not give informed consent because "[i]f the class had known the information that defendants failed to disclose, the class would not have consented to the injection or radiation." Am. Comp. ¶ 132. Under applicable law, however, a claim for battery premised on lack of informed consent in the medical context should be treated as a claim for medical malpractice (or "absence of consent" as the Plaintiffs have styled it). *See Romatowski v. Hitzig,* 227 A.D.2d 870, 643 N.Y.S.2d 686, 689 (1996) ("[W]here medical treatment is rendered with the actual consent of the patient, any alleged lack of informed consent is medical malpractice and not the intentional tort of assault and battery."); *Dries v. Gregor,* 72 A.D.2d 231, 424 N.Y.S.2d 561, 564 (1980) (holding that medical treatment beyond the scope of patient's consent should not be treated as battery); *Feeley v. Baer,* 424 Mass. 875, 878 n. 4, 679 N.E.2d 180 (1997) (noting that "[m]ost authorities prefer to treat informed consent liability solely as an aspect of malpractice or negligence") (citations omitted); *Moore v. Eli Lilly and Co.,* 626 F.Supp. 365, 367–68 (D.Mass.1986) (Wolf, J.) ("In accordance with [the] 'modern view,' Massachusetts allows plaintiffs to maintain cases in which there was an alleged lack of informed consent as negligence actions" but not as battery actions.).

The Plaintiffs attempt to distinguish these cases by citing *Tom v. Lenox Hill Hosp.,* 165 Misc.2d 313, 627 N.Y.S.2d 874 (Sup.Ct.1995), a case in which a patient was allowed to proceed on a battery theory when his procedure was performed by a different doctor than the one to whose treatment he had consented. The Plaintiffs cite this case for the argument that where "the risks of the procedure were inadequately explained," a claim for battery may lie. Pl.Mem. at 70. To the contrary, the case actually states that "when a physician tells a patient that he is going to perform a specified surgery but neglects to tell the patient the risks of the surgery to be performed by that physician, again a claim for lack of informed consent, *rather than for battery,* is stated." *Tom,* 627 N.Y.S.2d at 876 (emphasis added).

Essentially, the Plaintiffs argue that a battery claim may lie when "a doctor intentionally hits a patient in the mouth with a baseball bat, just to see how many teeth he can knock out," Pl.Mem. at 69, and that the behavior of the defendants in the instant action was analogous to such conduct. This argument fails, however, because the Plaintiffs have not alleged that their decedents were unwilling participants in the BNCT trials, as the patient would be during a doctor's batting practice. Rather, the crucial allegation in the Plaintiffs' case is that their decedents would not have consented to the experiments had they been given full information. As such, the Plaintiffs' action is one for lack of informed consent, and therefore the motion to dismiss the battery claim is GRANTED.

### F. *Count IV—Intentional Infliction of Emotional Distress*

■ The Plaintiffs assert a claim in Count IV for "intentional infliction of emotional distress." The elements of this cause of action are similar under both Massachusetts and New York law. In Massachusetts, to state a claim for intentional infliction of emotional distress, a

plaintiff must allege: "(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, ... (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." *Tetrault v. Mahoney, Hawkes & Goldings,* 425 Mass. 456, 466, 681 N.E.2d 1189 (1997). Likewise, in New York, a plaintiff must allege: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699, *aff'd* 82 N.Y.2d 690, 601 N.Y.S.2d 572, 619 N.E.2d 650 (1993).

The tort of intentional infliction of emotional distress originally developed for cases in which some third party, usually a family member, directly witnessed some tortious conduct that caused harm to a victim. *See generally* Hon. Steven R. Plotkin, The Evolution of Tort Liability for Psychic Injuries: A Proposal to Protect Relational Interests (1986) (unpublished Ll.M. thesis, University of Virginia) (on file in these chambers) (discussing historical development of torts such as intentional infliction of emotional distress). Given the ephemeral nature of the purported harm, courts have narrowly construed the tort, requiring that certain objective tests be met to legitimate plaintiffs' claims of emotional distress. Thus, in Massachu-

setts there must be "substantially contemporaneous knowledge of the outrageous conduct, and a severe emotional response." *Nancy P. v. D'Amato,* 401 Mass. 516, 522, 517 N.E.2d 824 (1988) (holding mother could not recover for emotional distress suffered after discovering her daughter was sexually molested several months before). The "severe emotional response" is generally construed to require some physical manifestation of harm. *See id.* at 519, 517 N.E.2d 824. In New York, these two requirements are expressed in the disjunctive, rather than the conjunctive. *See Iannotti v. City of Amsterdam,* 225 A.D.2d 990, 990–991, 639 N.Y.S.2d 537 (1996) ("[T]here can be no recovery absent a sufficient guarantee of the genuineness of the claim, invariably requiring some competent evidence of contemporaneous or consequential physical harm...."). Therefore, the Court analyzes the Plaintiffs' claims under the more generous New York standard in order to determine first whether an actual conflict of laws exists.[10]

■ With respect to the first requirement, "contemporaneous knowledge" of the injury, the Plaintiffs would appear to fail given that the physical harm to their decedents occurred over three decades before they claim to have suffered emotional distress. Thus, for instance, in *Gore v. Daniel O'Connell's Sons, Inc.,* 17 Mass. App.Ct. 645, 461 N.E.2d 256 (1984), the court held that the children of an injured construction worker could not base a claim for emotional distress on a date of "claimed awareness" of their father's condition almost three years after the accident. *Id.* at 650, 461 N.E.2d 256. In dismissing the claims, the court noted that these facts "hardly qualif[y] as an emotion-

---

**10.** The Plaintiffs also claim that the Massachusetts Supreme Judicial Court has watered down the "contemporaneous" requirement, at least when a defendant has actively concealed the primary tortious conduct. *See Nancy P.,* 401 Mass. at 522, 517 N.E.2d 824 ("Because [defendant] told [victim] not to tell anyone about the incidents and it may be inferred

that she was, therefore, afraid to tell her mother about these events for many months, we lay little stress on the absence of substantially contemporaneous knowledge in deciding the issue."). Thus, if the rule of Nancy P. applies here, the Massachusetts standard becomes functionally similar to New York's rule.

al trauma at the scene of the accident or closely on the heels of the accident." *Id.*

In this case, the Plaintiffs have alleged that they did not become aware of the true nature of the experiments until 1995. *See* Am.Comp. ¶ 4.[11] Thus, they cannot claim "substantially contemporaneous knowledge" of the harm inflicted upon their decedents. Nevertheless, the Plaintiffs seek to circumvent this problem by defining the injury not as "the previous BNCT experiment with its attendant pain but the current awareness that the pain and suffering were needless." Pl.Mem. at 84. This argument fails because even if the injury is defined in that manner, the challenged conduct on the part of the defendants still occurred over three decades prior to the injury. There simply cannot be a contemporaneous link between the experiments, which occurred in the 1950s and 60s, and the claimed emotional distress, which occurred in 1995 when the President's Advisory Committee disclosed its report.

As for the second requirement, the Plaintiffs have not alleged any physical harm. Instead they charge only that the tortious conduct caused them "serious mental and emotional injuries...." Am. Comp. ¶ 105. "[A] plaintiff may not recover for negligent infliction of emotional distress unless she has suffered physical harm." *Lewis v. General Elec. Co.*, 37 F.Supp.2d 55, 58 (D.Mass.1999) (Ponsor, J.) (quoting *Nancy P.*, 401 Mass. at 519, 517 N.E.2d 824); *see also Njoku v. City of New York*, 254 A.D.2d 223, 679 N.Y.S.2d 139, 139–40 (1998) (noting that New York law would not permit recovery for emotional distress based solely on birth of stillborn child, but would if physical injury to mother was shown). Even under more liberal pleading requirements recently adopted by lower New York courts for claims of negligent infliction of emotional

distress, the Plaintiffs would be unable to meet the burden of showing a threat of physical harm to themselves. *See Johnson v. New York City Bd. of Educ.*, 177 Misc.2d 310, 676 N.Y.S.2d 444, 447 (Sup. Ct.1998) (noting that "[w]hile physical injury is no longer a necessary component for a cause of action for negligent infliction of emotional distress, a plaintiff must demonstrate that defendant breached a duty owed to her which either endangered plaintiff's physical safety or caused the plaintiff to fear for her safety....").

Thus, because the Plaintiffs have alleged neither of the prerequisites for an action for intentional infliction of emotional distress—that is, "substantially contemporaneous knowledge" or "physical harm"—the Court GRANTS the motion to dismiss Count IV of the Amended Complaint.

### G. *Count V—Strict Liability for Inherently Dangerous Activities*

■ The Plaintiffs fifth count, entitled "Strict liability for inherently dangerous activities," fails to state a claim. The scope of this tort under Massachusetts law is extremely limited and applies only when there is "an escape of a dangerous activity from the land of the defendant onto the land of another, causing injury or damage." *Thomalen v. Marriott Corp.*, 845 F.Supp. 33, 36–37 (D.Mass.1994) (Gorton, J.). In *Thomalen*, the District Court had to determine whether the Massachusetts courts would extend the ancient doctrine of *Rylands v. Fletcher* beyond its original use in land cases. The *Thomalen* court noted that recent Supreme Judicial Court precedent had expressly indicated that no such extension was warranted and "therefore conclude[d] that a Massachusetts court would not allow a claim of strict liability in this case where there was no escape of a dangerous instrumentality from [the defendant's] property." *Id.* at 37.

---

**11.** Such allegations, of course, give the Plaintiffs their best chance to avoid the statute of

limitations. *See* Heinrich I.

■ Under New York law, the standard is somewhat broader: "These abnormally dangerous activities, however, generally include uncommon or unnatural uses of land as well as activities which are uncommon or inappropriate to the place where carried on and which pose a risk which cannot be eliminated by the exercise of reasonable care...." *Mikula v. Duliba,* 94 A.D.2d 503, 507, 464 N.Y.S.2d 910 (1983) (holding that using firearms for hunting is not an abnormally dangerous activity). The relevant factors to be analyzed are these:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Doundoulakis v. Town of Hempstead,* 42 N.Y.2d 440, 448, 398 N.Y.S.2d 401, 368 N.E.2d 24 (1977). An analysis of these relevant factors here, however, shows that even under New York law this is not an appropriate case for finding an abnormally dangerous activity. True, there is a likelihood of great risk from experimental surgical procedures. *See Lareau v. Page,* 840 F.Supp. 920, 933 (D.Mass.1993) (citing the Restatement [Second] of Torts § 402A, comment k [1965] which recognizes "there are some products, especially drugs, which are quite incapable of being made safe for their intended and ordinary use, and yet the marketing and use of which is justified because they may avert an otherwise inevitable death.") *aff'd,* 39 F.3d 384 (1994). As medical ethical standards have shifted, physicians have developed methods of con-

ducting experimental surgeries without unreasonable harm to the subjects; namely, by obtaining full and informed consent. Such experimental treatments are a matter of common usage, at least among that subset of the population facing terminal illness. They are appropriately carried on in places such as the Brookhaven National Laboratory, Massachusetts General Hospital, and Massachusetts Institute of Technology. Moreover, the potential public benefit from experimental surgeries, properly conducted, outweighs the risk of harm.

■ The doctrine of abnormally dangerous activities was developed in order to deal with cases in which an activity, while socially beneficial, could not be conducted in a manner that eliminated incidental damage. Traditional tort principles could not regulate such activity. The Restatement (Second) of Torts 520 gave the classic example of construction dynamite blasting. In contrast, if the Plaintiffs' allegations regarding the Defendants' conduct are true in this case, then the traditional tort claims which the Plaintiffs have also brought are more than sufficient to regulate the charged conduct. Consider a simple illustration: what separates the Plaintiffs' allegations regarding the use of radiation treatment from the type of radiation therapy that occurs every day in hospitals is that the various defendants here are alleged affirmatively to have misrepresented the therapeutic worth of the treatment. The *Rylands v. Fletcher* rationale only applies when no such misconduct is required to show an unreasonable danger.[12] In this case, without the alleged misconduct, the only complained of activity is the conducting of experimental surgeries, something which no court has held appropriate for strict liability. *Cf.* Restatement (Second) of Torts § 402A

---

12. The Plaintiffs also argue that the BNCT treatments are actionable because they offered no therapeutic worth whatsoever, and thus amounted to "guinea pig" experiments. This again requires an element of miscon- duct—perpetrating medical experiments with no therapeutic worth—to distinguish the BNCT treatments from ordinary radiation therapy.

comment k (noting that strict liability is inappropriate for certain products such as experimental pharmaceutical drugs).

Thus, because the doctrine of strict liability for abnormally dangerous activities is inappropriately applied to the allegedly improper activities at issue here, the Court GRANTS the motion to dismiss Count V of the Amended Complaint.

### H. Count VI—Personal Injury Caused by Exposure To Toxic Substances

In Count VI of the Amended Complaint, the Plaintiffs seek recovery for "Personal injury caused by exposure to toxic substances." This cause of action apparently stems from a New York statutory provision which provides a statute of limitations discovery rule in all actions "to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance...." N.Y. C.P.L.R. 214-c. This provision is only a procedural one providing for tolling under the statute of limitations—it does not create any substantive rights of its own. Accordingly, this Court granted the Defendants' motion to dismiss Count VI of the Amended Complaint during the hearing held on March 18, 1999.

### I. Count IX—The Claim for Civil Responsibility for Crimes Against Humanity

The Plaintiffs have not established a cause of action for civil responsibility for crimes against humanity. It is true that international law is an inseparable part of American jurisprudence and as such is justiciable in the Courts of the United States, as noted by the dissent in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 451, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). See also Filartiga v. Pena–Irala, 630 F.2d 876, 885 (2d Cir.1980). But see Tel–Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir. 1984). It is also true, however, that "[i]nternational law does not require any particular reaction to violations of law.... Whether and how the United States

wishe[s] to react to such violations are domestic questions." In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1475 (9th Cir.1994).

None of the cases cited by the Plaintiffs recognizes a general private right of action under international law. Neither Filartiga, nor Xuncax v. Gramajo, 886 F.Supp. 162 (D.Mass.1995) (Woodlock, J.), support the Plaintiffs' contention because they merely apply international law as a standard under the Alien Tort Act, which itself provides for the use of international law as a rule of decision. See 28 U.S.C. § 1350. The availability of an alien's private right of action under section 1350, however, does not change the recognized general rule that the law of nations does not create private causes of action. See Tel–Oren, 726 F.2d. at 777–78; Handel v. Artukovic, 601 F.Supp. 1421, 1427 (C.D.Cal.1985).

The Plaintiffs cite In re Cincinnati Radiation Litig., 874 F.Supp. 796 (S.D.Ohio 1995), for the proposition that because the Nuremberg Code is part of the law of humanity, it may be applied in both civil and criminal cases by the United States federal courts. The In re Cincinnati opinion, however, only used the Nuremberg Code for historical background to the medical experiments conducted by the government at issue in the case. See In Re Cincinnati Radiation Litig., 874 F.Supp. at 819–22. Moreover, Justice O'Connor's dissent in United States v. Stanley, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), also cited by the Plaintiffs and by the In re Cincinnati court, merely relied on the Nuremberg Code for the proposition that the Constitutional promise of due process guaranteed a right to informed consent and a remedy for an injured military plaintiff. See In re Cincinnati, 874 F.Supp. at 822. Neither Justice O'Connor in Stanley nor the In re Cincinnati court stated that there was a private right to sue under the Nuremberg Code.

The Plaintiffs also contend that courts may imply a private right of action under the International Covenant on Civil and Political Rights ("the Covenant"). Most of the courts that have addressed this issue, however, have held that only self-executing treaties create a private right of action. *See Dreyfus v. Von Finck*, 534 F.2d 24, 30 (2d Cir.1976); *Igartua De La Rosa v. United States*, 32 F.3d 8, 10 n. 1 (1st Cir.1994); *Tel–Oren*, 726 F.2d at 809; *see also White v. Paulsen*, 997 F.Supp. 1380, 1386 (E.D.Wash.1998) (noting that "the United States Senate expressly declared that the relevant portions of the [the Covenant] were not self-executing when it addressed this issue providing advice and consent to the ratification of the [the Covenant]"). Of the courts to address the issue, only the *White* court intimated that "federal courts have the authority to imply the existence of a private rights of action for violations of jus cogens norms of international law," in the absence of express self-execution of a treaty. *See White*, 997 F.Supp. at 1383.

While the Plaintiffs rely on *White* as a basis for judicial authority to imply remedies for jus cogens norms of international law, even the *White* court declined to do so for reasons applicable under the facts of this action. Specifically, the *White* court considered first and foremost whether there were adequate domestic remedies for the alleged conduct underlying the Plaintiffs' "crimes against humanity" cause of action. *See id.* at 1384. Like the *White* plaintiffs, the Plaintiffs in this case have stated tort law causes of action that provide effective legal redress. The *White* opinion also noted that the United States Senate declined to pass legislation (similar to the Torture Victim Protection Act of 1991) which would have created a new private right of action enforcing the rights recognized in the Covenant because "existing United States Law is adequate to enforce those rights." *Id.* at 1384 (*quoting* S. Exec. Rep.· 102–23, at 14–15 [1992] ). This legislative history defeats the Plaintiffs' contention that because Congress omitted claims such as theirs when it adopted the Torture Victim Protection Act, this Court should imply a remedy for Covenant violations. Finally, the *White* court hesitated to imply a private right of action because it was being asked to address a matter principally entrusted by the Constitution to the legislature. *See White*, 997 F.Supp. at 1384. The *White* court refused to imply a private right of action because "[t]he determination of what international obligations the United States chooses to recognize or enforce ... has long been ... entrusted principally to the Legislature and Executive branches of the federal government." *Id.* For each of these reasons, the Court declines to imply a private right of action under the Covenant or other international law.

Because the United States Senate and all the courts to consider the issue have held that the Covenant is not self-executing and a private right of action should not be implied, the Plaintiffs have no recognized cause of action for civil responsibility for crimes against humanity. Thus, this Court GRANTS the Defendants' motions for dismissal of Count IX for failure to state a claim upon which relief may be granted.

### J. *Viability of the Civil Conspiracy/Concerted Action Theory*

The defendants' remaining arguments hinge on the assumption that the actions of co-defendants cannot be imputed to each other. Thus,

▶ Associated Universities argues that the Plaintiffs who were treated in Massachusetts lack standing to assert claims against Associated Universities, as they have alleged no conduct taken by Dr. Farr or Associated Universities directly against them.

▶ Associated Universities argues that the counts for fraud (II) and negligent misrepresentation (XI) should be dismissed because no false statements

are alleged to have been made by Dr. Farr or Associated Universities.

▶ Mass General and MIT each argue that all counts brought by Van Dyke should be dismissed against them, as they had no relationship with Van Dyke giving rise to a duty of care.

▶ MIT argues that all claims against it should be dismissed as its role in the experiments was too limited to give rise to a duty of care.

■ To set forth a civil conspiracy theory of liability, the Plaintiffs must present sufficient facts such that "the circumstances of fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b); *see also Hayduk,* 775 F.2d at 444. Specifically, a complaint alleging a conspiracy based on fraud requires "specification of the time, place and content of an alleged false representation...." *Id.* Thus, the First Circuit has dismissed a claim of conspiracy for failure "to allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy." *Kadar Corp. v. Milbury,* 549 F.2d 230, 233 (1st Cir.1977). Moreover, "mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." *Hayduk,* 775 F.2d at 444.

Similarly, under Massachusetts and New York law, to set forth a claim based upon a theory of civil conspiracy, one must allege one of the following elements from section 876 of the Restatement (Second) of Torts:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives sub-stantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*See Kurker v. Hill,* 44 Mass.App.Ct. 184, 188–89, 689 N.E.2d 833 (1998). "[T]he doctrine appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." *Id.* at 189, 689 N.E.2d 833 (internal quotations omitted). Two key requirements of the tort for purposes of the instant motions are (a) that the defendant be aware of and agree with the allegedly tortious conduct of its co-defendants, and (b) that the defendant engage in some tortious conduct itself in furtherance of the common plan. *See Pittman by Pittman v. Grayson,* 149 F.3d 111, 123 (2d Cir.1998) (defendant must know "the wrongful nature of the primary actor's conduct"); *Payton v. Abbott Labs.,* 512 F.Supp. 1031, 1035 (D.Mass.1981) (Skinner, J.) (charged conspirator-defendant must have engaged in tortious conduct of its own); *Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d 289, 295, 582 N.Y.S.2d 373, 591 N.E.2d 222 (1992) (noting requirement that "each defendant charged with acting in concert have acted tortiously.").

In order to survive the motions to dismiss, the Plaintiffs' Amended Complaint must satisfy both the heightened federal pleading requirement of Rule 9(b) and the ordinary requirement of alleging each essential element of the state law civil conspiracy claims. The various defendants naturally claim that neither of these requirements has been met.

■ The Plaintiffs have alleged the existence of a concerted effort during the 1950s and 1960s by and among all parties to solicit prospective experimental subjects

under knowingly false assurances of therapeutic worth, to conduct boron radiation treatments on the subjects with the knowledge that such treatments had no therapeutic worth, and to mislead the subjects, their heirs and the public about the true nature of the experiments until the President's Advisory Committee finally revealed the truth in 1995. Each defendant played a role in this alleged conspiracy. Dr. Sweet, who was on staff at Mass General, allegedly worked closely with Dr. Farr, who was on staff at Brookhaven National Laboratory, to develop the theory of BNCT, procure experimental subjects, conduct experiments, and publish joint reports regarding the experiments' results. Patients admitted to Mass General became potential subjects for Drs. Sweet and Farr. Many were transferred from Mass General to Brookhaven National Laboratory for the initial rounds of experiments. Later, Dr. Sweet conducted experiments at the radiation laboratory of MIT instead of at Brookhaven National Laboratory. As a founding member of Associated Universities, MIT was linked to Brookhaven even during the initial rounds of experiments because Associated Universities contracted with the Atomic Energy Commission to conduct the experiments at Brookhaven.

Thus, the Plaintiffs have alleged affirmative conduct on the part of each defendant. They have also alleged that the scheme was perpetrated knowingly and purposefully by each defendant. As such, the Court rules that the pleading requirements of Rule 9(b) and state law have been met. Although Rule 9(b) does require heightened pleading requirements. for claims

such as the Plaintiffs' that are in the nature of fraud, the Rule should not be read to eviscerate the otherwise generous standard of notice pleading that the Federal Rules adopt. So long as defendants receive specification of the time, place, and content of the alleged conspiracy, the purposes of Rule 9(b) are met. Such is the case here. Therefore, the Court DENIES each of the defendants' motions to dismiss inasmuch as they rely on a rejection of the theory of civil conspiracy/concerted action.

### K. Availability of Punitive Damages

The Plaintiffs have requested punitive damages in their prayer for relief. See Am.Comp. ¶ 77 (seeking no "less than Three Million Dollars" of "punitive and exemplary" damages for each class member). Associated Universities argues that any claim for punitive damages is barred by New York's Survival Statute and Wrongful Death Statute, both of which specifically prohibit punitive damages for cases involving a person who died before September 1982. For instance, the Survival Statute provides:

> [P]unitive damages shall not be awarded nor penalties adjudged in any such action brought to recover damages for personal injury where the death occurs on or before August thirty-first, nineteen hundred eighty-two.

N.Y. E.P.T.L. 11–3.2(b). Similar language is contained in the Wrongful Death Statute. See N.Y. E.P.T.L. 5–4.3(b). So long as New York law applies, therefore, the claims for punitive damages are barred.[13]

The New York statutes operate as a bar to punitive damages only inasmuch

---

**13.** The Plaintiffs argue that the New York statutes are inapplicable to claims brought directly, rather than on behalf of the decedents. See Pl.Mem. at 71–72. Because the Court has dismissed the Plaintiffs' count for intentional infliction of emotional distress, however, no direct claims remain. The Plaintiffs also argue that several of their remaining counts—including the claims for Bivens violations (I), fraud (II), civil responsibility for crimes against humanity (IX), and "negligent infliction of emotional distress" (XI)—contain

allegations of emotional harm suffered by the plaintiff representatives rather than their decedents. Of these counts one has been dismissed (IX), and one has simply dropped out of the Amended Complaint (XI). As for the remaining claims, they do in fact allege that the defendants' conduct caused emotional harm to the Plaintiffs. To that extent, the claims must be collapsed into the count for infliction of emotional distress, which has already been dismissed.

as New York choice of law principles recommend the statutes' application in this case. Of the counts in the Amended Complaint, two present claims that are arguably governed by law that permits punitive damages, thereby raising choice of law concerns. The choice of law analysis for the first of these claims is easily resolved. The *Bivens* claim (Count I) is not subject to the New York statutes as it is a purely federal cause of action governed by federal law. Supreme Court case law indicates that "punitive damages may be awarded in a Bivens suit." *Carlson v. Green*, 446 U.S. 14, 22, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *see also id.* ("Punitive damages are a particular remedial mechanism normally available in the federal courts.") (quoting *Bivens*, 403 U.S. at 397, 91 S.Ct. 1999).

■ The second claim, the wrongful death claim (Count VIII), requires more discussion. In Massachusetts, punitive damages are available in wrongful death actions. *See* Mass.Gen.L. ch. 229 § 2. Thus, the availability of punitive damages in Massachusetts creates a direct choice of law conflict for the wrongful death claim, and the Court must engage in the state law interest analysis identified above in Section III(D).[14]

As it turns out, a New York court has already faced with analogous situation. In *Beasock v. Dioguardi Enters., Inc.*, 100 A.D.2d 50, 472 N.Y.S.2d 798 (1984), plaintiff brought a survival action to recover punitive damages for the death of plaintiff's decedent when a truck tire exploded at a gasoline station. The injury occurred in New York, while the tire was designed and manufactured in Ohio and the District of Columbia, two jurisdictions which, unlike New York, permit punitive damages in

survival actions. *See id.* at 800. The court examined the relative state interests at issue, noting that New York has an interest in protecting defendants from excessive liability while Ohio and the District of Columbia have an interest in deterring egregious conduct. *See id.* at 801. In determining which interest should yield, the court specifically noted that for deaths which occur after 1982, New York does not prohibit punitive damages. Therefore, the court reasoned, "the change ... indicate[s] that the denial of punitive damages was not a very significant policy of New York at the time of injury...." *Id.* Indeed, "New York has no interest in seeing its former policy, which now has been clearly rejected, applied to this action." *Id.* (quoting *O'Brien v. Grumman Corp.*, 475 F.Supp. 284, 295 (S.D.N.Y.1979)).

This Court follows the reasoning of the *Beasock* court and holds that punitive damages are recoverable on the wrongful death count (Count VIII). Because New York has removed its prohibition on punitive damages for wrongful death actions arising from deaths occurring after 1982, New York's interest in avoiding excessive liability in cases occurring before 1982 is relatively weak and must yield to Massachusetts' interest in deterring egregious conduct. Therefore, the motion to dismiss all claims for punitive damages is DENIED with respect to the *Bivens* claim (Count I) and the wrongful death claim (Count VIII), and GRANTED with respect to all remaining counts.

IV. *Conclusion*

For the foregoing reasons, the Court takes the following actions with respect to the motions to dismiss filed by Sweet and Mass General (Docket # 33), MIT (Docket

---

14. A similar conflict does not occur under the Massachusetts Survival Statute. As Judge Mazzone has noted, Mass.Gen.L. ch. 228, § 1 only preserves actions for compensatory damages. *See Glanz v. Vernick*, 750 F.Supp. 39, 44 (D.Mass.1990). "To the extent that plaintiff seeks an award to punish the transgres-

sor," the rationale behind the statute is inapplicable. *Id.* Thus, because no direct conflict of law exists, recovery of punitive damages is barred under the New York Survival Statute for state law claims other than the wrongful death count.

# 35), and Farr and Associated Universities (Docket # 42). The Court GRANTS the motions to dismiss as to Counts III, IV, V, VI, and IX; DENIES as to Counts II, VII, VIII, X, and XI; GRANTS as to the prayer for punitive damages under Counts II, VII, X, and XI, and DENIES as to the prayer for punitive damages under Counts I and VIII; and ORDERS further briefing on the defense of the statute of limitations.